FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 FEB 16 AM 9: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| BETTYE G. WILSON. | ) | |
| Plaintiff, | ) | |
| vs. | ) | CIVIL ACTION CV 99-J-0458-S |
| ALCON LABORATORIES, INC., | ) | |
| Defendant. | ) | |

ENTERED

FEB 1 6 2000

## MEMORANDUM OPINION

Currently before the Court is Defendant Alcon Laboratories, Inc.'s motion for summary judgment (doc. 15) along with briefs in support and in opposition of said motion. Having considered said motion, the Court finds that for the reasons set forth below, Alcon Laboratories, Inc.'s motion for summary judgment is due to be GRANTED.

## Undisputed Facts

Taken in the light most favorable to the plaintiff, the undisputed facts of this case are as follows:

Plaintiff Wilson has suffered with poor vision since childhood. Deposition of Bettye G. Wilson at 31. Upon moving to Alabama in 1986, Plaintiff began treatment with Dr. Logan Smith, an operant ophthalmologist. Wilson Depo. at 35; Deposition of Dr.

1

20

Logan Smith at 8. Initially, Wilson saw Dr. Smith once a year; however as Plaintiff's vision became more cloudy and less focused, Plaintiff sought treatment more frequently. Wilson Depo. at 38. The symptoms Plaintiff complained of, beginning in August of 1996, were associated with cataracts. Smith Depo. at 14; Deposition of Dr. Richard Feist at 72.

As Plaintiff's vision in her right eye continued to deteriorate, it was more difficult for her to perform her work. Wilson Depo. at 40; Smith Depo. at 15. Eventually, Plaintiff's vision was reduced to 20/50 in her right eye and cataract surgery was recommended. Smith Depo. at 16, 19. Dr. Smith performed the cataract surgery on February 26, 1997. Smith Depo. at 20; Wilson Depo. at 66.

Cataract surgery involves the removal of the eye's natural lens from the capsular bag and replacing it with an intraocular lens implant. Smith Depo. at 8. The capsular bag is the part of the human eye that contains the intraocular lens, keeping it in position. Smith Depo. at 32. The lens implant consists of an optic, which is the clear, circular portion through which the patient sees, and the haptics which are flexible, arm-like extensions from the optic that hold the lens in position by pressing against the capsular bag. Smith Depo. at 24; Feist Depo. at 53. The lens is inserted after the natural lens is removed, which includes the eye nucleus and cortical material. Smith Depo. at 31. This procedure can cause damage to the capsular bag, affecting the positioning of the lens implant. Smith Depo. at 32-33. Such damage can occur without the surgeon's

knowledge. Smith Depo. at 37.

Though there are several lens implants to chose from, Dr. Smith chose one manufactured by the Defendant. Smith Depo. at 20- 21. In deciding on AcyrSof lens, Dr. Smith considered his favorable experience with the lens and the characteristics of the lens. Smith Depo. at 25, Part II 35-36. One such characteristic is the acrylic material from which the lens is made, allowing the lens to "fold." *See Id.* This ability to fold allows the surgeon to implant the lens through a smaller incision. Smith Depo. at 26. When performed correctly, this point of the process is the point at which the haptic portion of the lens implant will have the most pressure.[1] Smith Depo. at 27. Therefore, according to Dr. Smith, if there was a defect in the lens, it would most likely be detected upon folding and insertion. *Id.* Dr. Smith noticed no such defect at the time the lens was implanted. Smith Depo. at 27-28.

Postoperatively, Plaintiff's vision improved.[2] Smith Depo. at 38. However, shortly after the lens implant, Plaintiff again began experiencing pain and blurred vision in her right eye. Upon examination, Dr. Smith surmised that Plaintiff's retina was not getting adequate light and thereby prevented her from seeing with the clarity he thought would be achieved through the lens implant. Wilson Depo. at 78. At this point, Dr.

---

[1] During this procedure, it is possible to damage the lens or haptics by folding them improperly or improperly inserting the lens into the capsular bag. Smith Depo. at 34.

[2] On April 8, 1997, Plaintiff's visual acuity was at 20/25. Smith Depo. at 38.

Smith determined a second procedure to correct this problem was necessary. Wilson Depo. at 79. At the time this recommendation was made, Plaintiff was neither told there was something wrong with the lens nor did she have reason to think there was a problem with the lens. Wilson Depo. at 78-79.

On May 19, 1997, the second procedure was performed on Plaintiff. This procedure, known as a YAG laser capsulotomy, is a laser surgery that cuts a hole in the posterior capsule. Smith Depo. at 46. YAG procedures are performed on patients whose vision is decreased because of opacification, or cloudiness, to the posterior capsule. Smith Depo. at 45.

Neither Dr. Smith nor Plaintiff recall anything that would suggest a problem with the implant prior to the YAG procedure. Smith Depo. at 46; Wilson Depo. at 88-9. When the YAG was performed, there was no indication that the lens was de-centered. Smith Depo. at 51. Further, during the procedure, Dr. Smith observed the implanted lens and made no note of any apparent irregularities of her lens. Smith Depo. Part II at 25-26. Dr. Smith reported no complications from the YAG procedure, with no indication of abnormal inflammation or increased intraocular pressure four hours postoperatively. Smith Depo. at 55.

The day after the YAG procedure, Plaintiff contacted Dr. Smith complaining of double vision with her glasses off and that her eye was still dilated. Smith Depo. at 57. Plaintiff additionally claimed cloudy vision and intense, throbbing, continuous pain.

Wilson Depo. at 93. Upon examination, it was determined the lens was moving out of its proper position.[3] Smith Depo. Part II at 6. Dr. Smith opined that the capsular edges were separating allowing the lens to drop. *Id.*; Wilson Depo. at 97. However, he was not able to say that there was anything wrong with the lens implant.[4] To correct this, Dr. Smith informed Plaintiff a third procedure would be necessary. Wilson Depo. at 98. At this time, Dr. Smith referred Plaintiff to a doctor who performed posterior vitrectomy, a procedure that removes the vitreous gel behind the iris. Smith Depo. Part II at 7; Feist Depo. at 88.

The third procedure was performed by Drs. Feist and Callahan. Wilson Depo. at 99; Feist Depo. at 88. Plaintiff was examined by Dr. Feist initially who determined her vision in her right eye was decreased and that the implant was inferiorly malpositioned. Feist Depo. at 67. Based on his examination, Dr. Feist recommended Plaintiff be very limited and careful in her activities. Wilson Depo. at 105. Additionally, Dr. Feist recommended Plaintiff be examined by Dr. Callahan as well. *Id.*; Feist Depo. at 86. Both Drs. Feist and Callahan joined Dr. Smith in recommending the third procedure be performed. Wilson Depo. at 107. While the third procedure was being performed, it was

---

[3] This determination, made on May 21, 1997, was the first indication that the lens was moving out of position. Smith Depo. Part II at 6.

[4] Dr. Smith's second deposition was taken January 12, 2000. He testified that looking at his notes from May 21, 1997 he was still not able to say that there was anything wrong with the lens implant on that date. Smith Depo. Part II at 7.

discovered that the haptic portion of the lens was detached. Feist Depo. at 53; Wilson Depo. at 114. Neither Dr. Feist nor Dr. Callahan offered an opinion as to why the haptic broke off.[5] Feist Depo. at 64; Wilson Depo. at 115. Indeed, Plaintiff was never told by anyone that the implant was, or may have been, defective. Wilson Depo. at 207.

The haptic portion of the lens implant is still in Plaintiff's eye though Plaintiff's vision has improved and she is able to read and work. Wilson Depo. at 123-124. Though she has intermittent bouts of inflammation and increased pressure of her right eye, the pain has decreased and she is able to see more clearly. Wilson Depo. at 145; Feist Depo. at 104. However, Plaintiff continues to experience teariness, droopy eyes and discomfort. Wilson Depo. at 157. Additionally, Plaintiff has regained her ability to drive. Wilson Depo. at 164. Plaintiff now describes her vision as "pretty good." *Id.*

In February 1999, Plaintiff filed this action against Defendant alleging that Defendant breached the warranty of merchantability in that the lens implanted into Plaintiff was not fit for the ordinary purpose for which it is used (doc. 1, Count I), breached the implied warranty of fitness for a particular purpose (doc. 1, Count II), and committed negligence and wantonness in the design, manufacture and/or sale of the lens (doc. 1, Count II). Additionally, Plaintiff made a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") (doc. 1, Count III).

---

[5] Dr. Feist testified later in his deposition of the possibility the haptic was not providing sufficient support to the optic, causing the haptic to bend. Feist Depo. at 69.

## Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that

there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding*, 1998 WL 758012 (S.D. Ala.); citing *Anderson*, 47 U.S. at 251-252.

## Legal Analysis

Plaintiff has failed to state a claim under the AEMLD. To state a claim under the AEMLD, Plaintiff has the burden of proving by substantial evidence (1) that Defendant manufactured, designed, or sold a defective, unreasonably dangerous product; (2) that the product reached the consumer in substantially the same condition in which it was sold; and (3) that the product injured the consumer when it was put to its intended use. *Browder v. General Motors,* 5 F.Supp. 2d 1267, 1280 (M.D. Ala. 1998) (*citing Beam v. Tramco,* 655 So.2d 979, 981 (Ala. 1995)); *see also Townsend v. General Motors Corp.,* 642 So.2d 411, 415 (Ala. 1994). Failing to establish her prima facie case under this analysis, Plaintiff's claim under the AEMLD fails as a matter of law.

It is undisputed that Defendant Alcon Laboratories is the manufacturer of the AcyrSof Lens implanted into Plaintiff's eye. Therefore, the threshold issue becomes whether the AcyrSof Lens was defective. A defect in a product is that which renders the product unreasonably dangerous and not fit for its intended purpose. *See Casrell v. Altec Industries, Inc.,* 335 So.2d 128, 133 (Ala. 1976). "Defective is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. Comment g. of the Restatement [Second of Torts (1965) ] states a defective condition applies when, at the time the product leaves the seller's hands, it is in a condition not contemplated by the ultimate consumer." *Id.*

However, mere proof that an accident occurred resulting in injuries is insufficient

9

to establish a defective product, and therefore liability, under the AEMLD. *Allstate Insurance Co. v. Mitsubishi Electronics of America,* 709 So.2d 1306, 1307 (Ala. Civ. App. 1998) (*citing Sears, Roebuck & Co. v. Haven Hills Farm, Inc.,* 395 So.2d 991 (Ala.1981)). A plaintiff's evidence must go beyond the fact an accident occurred and affirmatively show that the product was sold with a defect or in a defective condition. *Id; see also Schwartz v. Volvo North America Corp.,* 554 So.2d 927 (Ala. 1989). This is not to say that the specific defect, i.e., the exact act, omission, process or construction, that caused the injury must be proven. *Haven Hills,* 395 So.2d at 994; *Goree v. Winnebago Industries, Inc.,* 958 F.2d 1537, 1541 (11th Cir. 1992). However, the Plaintiff is required to go beyond pure speculation or conjecture. *Cooper v. Toshiba Home Corp.,* 76 F. Supp.2d 1269, 1276 (M.D. Ala. 1999) (*citing General Motors Corp. v. Edwards,* 482 So.2d 1176 (Ala. 1985).

In the case at bar, Plaintiff has done little more than offer speculation that the AcyrSof lens was defective at the time it left Defendant's control. There can be no question that the separation of the haptic portion of the lens constitutes product failure. Indeed, Defendant arguably concedes as much. *See* Defendant's Reply at 3. However, as stated above, product failure does not rise to the level of a product defect; the fact that someone is injured while using the product does not establish a defect. Plaintiff must

affirmatively show a defect in the product.[6] *Brooks v. Colonial Chevrolet-Buick,* 579 So.2d 1328, 1333 (Ala.1991).

Plaintiff's expert, Dr. Feist, clearly indicates that there are several reasons in addition to a possible manufacturer's defect that could have caused the lens to separate. Specifically, Dr. Feist testified at his deposition that he did not have an opinion as to what caused the haptic to separate from the lens. Feist Depo. at 63-64. He testified that he "could come up with a shopping list of possibilities [as to what caused the haptic to separate]. But in terms of knowing which it was, we just really don't know." Feist Depo. at 88. Concurring in this opinion, Dr. Smith states that it was possible to damage the haptic by improper folding or insertion of the lens in to the capsular bag; that it is possible to damage the haptic during laser surgery, and that it was possible the haptic separated from the lens upon removal of the implant by Drs. Feist and Callahan. Smith Depo. at 34, 54-55; Smith Depo. Part II at 43-44.

Furthermore, Dr. Smith, the doctor who actually performed the implant procedure, stated he noticed no defects at the time the lens was inserted[7] in Plaintiff's eye or prior to the YAG procedure performed months later on the Plaintiff. Smith Depo. at 28, 46. In

---

[6] Plaintiff must prove that the product was substantially unaltered when used by [her] and must also prove causation in fact, including proof that the defect caused the injury and that the defect is traceable to defendant. *Brooks,* 579 So.2d at 1332.

[7] Dr. Smith testified in his deposition that if there were a defect in the lens, it would most likely be observed during the implant procedure. Smith Depo. at 27.

fact, the first time Dr. Smith noticed the lens was decentralized was on May 21, 1997, when Plaintiff returned to Dr. Smith after the YAG procedure was performed. Smith Depo. Part II at 6.

While Plaintiff suspects that the injuries to her eye were caused by a defect in the lens itself, she has provided the Court with no evidence of such a defect.[8] Clearly, Plaintiff's failure to provide evidence of a defect leaves the Plaintiff with no proof that the damage to lens, causing it to separate, occurred while in Defendant's control. *See Allstate Insurance,* 709 So.2d at 1308. Plaintiff, having failed to proffer evidence to support the conclusion that the lens implant was defective and/or unreasonably dangerous when it left the hands of the seller, Plaintiff has not sustained her burden under the AEMLD. *Sapp v. Beach Aircraft Corp.,* 564 So.2d 418, 420 (Ala. 1990) (*citing Atkins,* 335 So.2d at 146).

In addition to her claim under the AEMLD, Plaintiff's claims of breach of the implied warranties of merchantability and fitness for a particular purpose fail. In an action for breach of an implied warranty, the plaintiff must prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach. *Storey v. Day Heating and Air Conditioning Co.,* 56 Ala. App. 81, 83, 319 So.2d

---

[8] The Court notes that Plaintiff did offer the fact Dr. Smith has performed this type of procedure many times and the language of the product information sheet relating to Alcon's guarantee of sterility as evidence the product was substantially unaltered. Plaintiff's Brief at 11. Without deciding on the relevancy of this evidence, the Court finds this evidence to be insufficient to carry Plaintiff's burden in opposing a motion for summary judgment.

279, 280 (1975).

Defendant claims that a breach of the warranty of merchantability presupposes proof of product defect. Defendant's Brief at 12. In support of this contention, Defendant cites the Alabama Supreme Court's recognition in *Haven Hill Farms* that the AEMLD incorporates in the definition of defect the doctrines of merchantability and fitness for a particular purpose. *Id. (citing Haven Hills Farms,* 395 So.2d at 994). However, a distinction is to be made between the AEMLD and the Uniform Commercial Code ("UCC"). The UCC concerns itself with the *quality* standards of the product while the AEMLD focuses its attention on the standards of *safety* of the product. *See Shell v. Union Oil Co.,* 489 So.2d 569, 571 (Ala. 1986).

To state a claim under the implied warranty of merchantability, Plaintiff must prove the lens was not fit for the ordinary purposes for which such lenses are used. Ala. Code § 7-2-314(2)(c) (1975). Again, while there is no question the product failed, Plaintiff's failure to put forth any evidence that its failure was related to a manufacturing defect leaves the Plaintiff without proof the lens was not fit for ordinary purposes. A product's failure does not per se constitute proof it is unmerchantable, especially where, as here,[9] there is significant evidence pointing to other possible causes for its failure.

A warranty for fitness for a particular purpose is implied if: (1) the seller has

---

[9] The testimony of the three physicians who treated Plaintiff overwhelmingly supports the strong inference the lens' failure may not have been caused by a manufacturing defect. *See* Feist Depo. at 64, 88; Smith Depo. at 34, 54-55; Smith Depo. Part II at 43-44

reason to know the buyer's particular purpose, (2) the seller has reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer, in fact, relied upon the seller's skill or judgment. *See Shell v. Union Oil,* 489 So.2d at 572.

Defendant argues Plaintiff's claim fails for failure to put forth evidence she informed Defendant of some "particular purpose" Defendant's Brief at 13, n.2. This argument is devoid of merit. The official comment to § 7-2-315 states a buyer need not prove seller had actual knowledge of the particular purpose for which the goods are intended or of buyer's reliance" if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." Ala. Code § 7-2-315, comment 1. This Court would be hard-pressed to accept that the circumstances surrounding the transaction did not make it glaringly obvious to all interested parties that Plaintiff intended to use the lens as an implant for her eye.

Regardless of this Court's finding of Defendant's constructive knowledge of Plaintiff's particular purpose and reliance on Defendant's skill, the claim of breach of implied warranty of fitness for particular purpose fails. Similar to the implied warranty of merchantability, a claim for the breach of the implied warranty of fitness for a particular purpose fails because Plaintiff can not show the product was defective. None of Plaintiff's treating physicians, one of whom is designated as her expert, can testify as to the cause of the haptic separating from the lens. Feist Depo. at 64 ; Smith Depo. at 46 .

Finally, in addition to Plaintiff's claims under the AEMLD and for breach of implied warranties, Plaintiff seeks recovery on theories of negligence and wantonness. These two common law claims have been subsumed by the AEMLD. *Veal v. Teleflex, Inc.*, 586 So.2d 188, 190-91 (Ala.1991); *see also Pitts v. Dow Chemical*, 859 F.Supp. 543 (M.D. Ala. 1994).

## Conclusion

For the reasons set out above, the Court is of the opinion that no genuine issues of material fact exist. Accordingly, Defendant's Motion for Summary Judgment is due to be GRANTED in all counts.

**DONE** and **ORDERED** this the ___15___ day of February, 2000.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE